Our next case is United States against Lamar McCullough. Mr. Ashley, whenever you're ready. Good afternoon and may it please this honorable court, Michael T. Ashley for the appellant, Mr. Lamar McCullough. The government's opening line in Mr. McCullough's trial stated that this case is about a shooting that happened on March 5th, 2021 in the city of Newark and we think that speaks precisely to the circumstance under which Mr. McCullough's trial occurred. I would submit that it is accurate that the trial in fact was about a shooting despite the fact that Mr. McCullough had been charged under 18 USC 922 G1 with a possessory offense of bullets, specifically possessing bullets by a convicted felon. The charge inherently, as I said, possessory, nonviolent, and a victimless offense. Nonetheless, the trial court did allow the introduction of photographic evidence depicting nothing but puddles of blood in the middle of a sidewalk, extensive testimony about the shooting itself and the victim thereof, and ultimately the identification of Mr. McCullough as the shooter by the lead case detective, Detective Figueroa. Mr. McCullough appropriately objected to the introduction of the aforementioned categories of evidence based principally on rules 401 and 403. The pretrial rulings of the court to which the government assented set forth the evidence of the shooting victim would be limited. However, once the trial started, as I just presented, it was not, and these arguments are now before your honors. The video of the shooting was played numerous times during the course of the trial. What was the probative value of that video of a shooting in the context of this possessory offense? Numerous witnesses available to the government could have established that a shooting occurred and that bullet casings and bullets themselves were in fact collected from the scene. So what is also the probative value of these puddles of blood in the middle of the street in this possessory indictment? The risk of prejudice, of course, is as high as it gets. The emotions of the jury were inflamed from the moment the trial was opened, talking about a shooting to the many times they had to see that video, and certainly there are some photographs that can only be considered as chilling that show blood flowing down a number of steps in the street, your honor. Was there discussion of stipulations around some of the fact issues that these pools of blood photographs purported to establish? There were discussions around stipulations, your honor. Having been the trial attorney myself, I can, and having gone through this recently, I don't recall that there were any stipulations regarding those facts. Certainly, if there was an offer to stipulate, for instance, that that's what I'm trying to understand what and your honor can infer, we did stipulate quite a number of things, authenticity of various items. We also stipulated to the defendant's prior conviction. So there was willingness to stipulate to those facts that we saw as demonstrable, which were pertinent to the government's case. There's one passage in the transcript where there's sort of a concession that, as I remember it, the fact of the shooting we, the defense, concede is coming in. I think there are close four or three questions in the appeal, but some of it seems to have been, if not conceded, everybody's on the same page that it was going to happen. I think it certainly, I recall that statement with specificity, your honor. Your honor is correct in recalling the spirit of what was said. I would just perhaps place it in context of where we were at that moment. We came on to those pretrial motions and eliminate with a strong position that there should be no evidence of the shooting whatsoever, no evidence of the victim, certainly none of the photographs in which it was solely blood. There was a concession that there were some photographs that had both bullet casings and blood, which we can see now are probably necessary for the government to prove its case insofar as it was a prosecution for bullets. There were some latter points as the judge had started to make preliminary rulings or at least the court gave a sense that the government would be all but precluded from the entire prosecution if there was no evidence that a shooting occurred because the bullets were on the ground as a result of the shooting. I think there was an effort to be practical on one side to acknowledge that the court made it clear that there was going to be a trial. The indictment itself wasn't going to be dismissed just based on some overlap between what I would concede is appropriate evidence as far as the photographs of the bullets and perhaps this idea that a shooting happened, but we still, there was an effort by defense to tailor that as strictly as possible. So any comments regarding somewhat of a concession that some of this was going to come in was really just based on overlap that I think reasonably aligned. A line couldn't be drawn between a photograph with blood and with a bullet at the same time. So that perhaps was the nature of that comment. And thank you for the question. And with that, I do want to move forward to just discussing briefly what perhaps is a critical issue here, which is the district court's denial of Mr. McCullough's Frank's motion in the face of significant proofs demonstrating the falsity of the affidavit which have been further into that warrant. I think that part of the appeal sort of flags an issue that was central in the trial also, which is the identification testimony, the lay witness testimony. And you've got to, I mean, you know, Frank's is a, you got a tough hill there. But I think it would be helpful as somebody who was in the courtroom as opposed to us on the transcript to speak to the significance of letting an officer or an agent sit in a courtroom and say, yeah, it's my view that this is the defendant on that video. And just slightly delineating those two issues, Judge, I believe it's point two and point or perhaps point one and point three of our brief, Judge. So on one hand, given my experience in this case, I think there are some things that are separate from the trial that really speak to what happened here. I think it's very significant that before the actual encounter with Mr. McCullough, these videos had been reviewed and described by detective Figueroa. And it's notable that detective Figueroa and making those descriptions prior to encountering Mr. McCullough with the green Nike hat, which was the big piece of evidence here that we were moving to suppress. There was no description of any Nike symbols. I think there may have been one in which they said there may have been a logo, but there, as I recall it and the record will speak for itself, I believe there was no mention of specifically a Nike logo on any piece of clothing. So I think and going back to that, as I believe it was March 12th, 2021, when that investigatory stop happened, there was extensive cross-examination of detective Figueroa who had seen every video that's now before this court and was in, you know, had instructed those officers to response to that place with Mr. McCullough and not so much as a Terry stop occurred. So I think that the court, you know, doesn't need to rely on, frankly, the arguments of counsel. Even at trial, we can look at the investigation itself and the behavior of law enforcement in encountering this defendant closely in communication with this lead detective Figueroa, who ultimately was a critical witness, and they did not touch my client. They did not arrest him, which certainly to me suggests, absent any court involvement, that these officers at the direction of this lead detective certainly didn't feel like there was probable cause to arrest him at the time. And I think that looking back at the record, it's quite moving to me that on one hand, we have a situation where law enforcement in the field encountered the defendant, having everything this court has now, and frankly, the record will speak for itself, but I believe detective Figueroa testified at trial and said, well, we didn't arrest him because we didn't have probable cause at that time. And their actions would suggest that they didn't feel they had a reasonable suspicion. So the question as I see it, and this again really has nothing to do with litigation, but just as a matter of fact, is what changed if detective Figueroa's testimony is correct, and if I'm remembering correctly, that he said there was not probable cause at the time that investigatory stopped, what changed between that point and then later on him swearing to a court that the same videos that he relied on or that he had in his possession at the time the defendant was encountered then substantiated probable cause. So I think there's that Frank's aspect of it, and just while I'm talking about Frank's briefly, I'm watching the timer here and I apologize, I didn't reserve my five minutes, but I'm sorry, I apologize, your honors. I think with respect to Frank's, it's important to note that it's of course not limited at all to Mr. McCullough's certification. I think the ultimate offer of proof in this case is what your honors have requested in preparation for this hearing is those photographs, and I think that as to the case law that we cited as the spirit of Frank's and the spirit of his progeny in this circuit, it is not, it is really a demonstration of the willfulness of the affiant to say things that I submit as strongly as I can or just inconsistent with the record, especially if we look at that 180 Vermont. There's, if we look at detective Figueroa's affidavit, he says forth and you know, the defendant can be identified in the 188, and of course my words, not his, but essentially there's a paragraph that identifies Mr. McCullough in that video, and that's the exhibit A, which was attached to, I believe it's my reply to involving this Frank's hearing, and you see in that video, there's no face. I mean, the entire body of the individual we're talking about is just a few pixels. So this was, I called my French bulldog argument because I had said to the court at the time we were arguing this, there's some level of misrepresentation that is a reckless disregard. I think that on some level, there's some subjective, reasonable interpretation, which can be had by an affiant, but certainly if we saw a video and it depicted, you know, a non-human, a dog or something of that nature, and then, you know, the affidavit said otherwise, we would say that's obviously a reckless disregard for the truth because there was some question as to whether or not this was purely subjective and within the realm of the discretion of the detective and how he presented it. And then separately from that, of course, your honor, there's really, um, this court's president as well as Watson, uh, and there's that statement from the government, uh, pre-trial that, that, you know, we will not have detective Figueroa just come and say, um, you know, that is the defendant on the video. And then, uh, my objection was sustained. However, we did have that leading question, which the jury in some ways can't unhear, but there was a curative instruction. But, uh, we had a question from the USA, uh, that led her to the defendant on this video, uh, and so on. Yeah. I mean, and then there's the, the actual opinion offered by Figueroa where he says, yeah, that's the guy at the end of the testimony. Correct. Correct. Um, I see my time is at zero. I don't know if your honors want me to have a few other points. It's of course all contained in my papers. I'm glad to go on or I'm glad to open myself to questions, whatever you prefer. Yeah. Thank you. Thank you very much. Good afternoon. May it please the court. I'm assistant United States attorney, Serena Kamazole. I'm here on behalf of the United States, the appellee in this matter. I'd like to make three points in response to Mr. Ashley's argument first about the rule 403 balancing of the victim related evidence, then about the officer's identification testimony. And finally about the Frank's hearing and also happy to answer any questions the panel has speaking specifically about the victim related evidence. It's clear from the transcript that judge Hayden took great pains to weigh all of the evidence under rule 403 and very carefully admitted some and also excluded other evidence. Um, I'm unaware of any discussion below about stipulating to this evidence, but I think the transcript shows that as the court held oral argument on this topic, both sides, I think took and gave a little bit. I know the government, for example, backed off attempting to offer the photograph of the victim on the gurney. I think at some point the defense that's, that's not given much, is it? Well, I mean, there's a, there's a picture in the trial evidence of pools of blood on the steps in front of one of these apartment buildings. Um, and that didn't get much there. Yes, your honor. And, and I would agree that the, the three photographs of blood that came in at trial were sufficient for the government to prove its point. And it did not need to maybe be probative at that point. And to also call into question a lot of other issues around this incident that were not relevant to a nine 22 G ammo block. Well, there were, there were issues that the government needed to prove here and the possession of the ammunition. Why this is a federal case. I think judge Hayden explained why it's a federal case at sentencing, which is that the state was very reluctant to take a case where there were no eyewitnesses willing to testify, including the victim. And in fact, the people who lived on the street where this happened were too scared to even turn over their surveillance video without search warrants. I mean, she alludes to this fact and how this would have been a very difficult case for the state to bring. And I think it really required the federal government to amass its resources to package this evidence in the best possible light. And I, and I think that there's a role for nine 22 to play in a situation like that. I, I respect that. But this record reads like the, the line and you would say is we're sort of tasked with getting a conviction at all costs, maybe because of some of the concerns you just sort of alluded to. And there's actually a point in the transcript that one of my clerks found where the district court said, I hope when the third circuit clerks are looking at this, they can understand how challenging it was. And it, you know, the government put the district court in that challenging situation. I, you know, the, the steps photo, it's part of it. I think you should, you should move on to the, the lay witness opinion, which is, is very problematic. I'm happy to do that. Your honor, as we know from this court's decision in Fulton, um, a lay witness's opinion is not objectionable just because it embraces an ultimate issue. Yeah. I agree with you on that. We can carve out ultimate issue, but I think it's about what was the basis for the opinion. And I don't think Fulton and you tell me if you have other cases in mind, support the proposition that an officer can, can watch a bunch of tape and be in say, Oh, I'm familiar with this guy now. I don't think that's what the, the, the lay witnesses had as a basis of their testimony in our presence. I think Fulton, um, writes cases that explain that a lay witness can become familiar with the suspect's appearance. And the more familiar he is with their appearance, the more helpful his testimony is. There are other cases better equipped than the jurors to opine on the issues. If the jurors could see the same videos, the jurors could see the same video, but they did so in the course of what was essentially one day's worth of testimony spread over two days. Whereas the detective studied this video for a couple of weeks. So if an officer watches a video more, then they can testify as to the ultimate issue. I think there are a number of things here to look at. The first is he studied this video, these 45 videos, replayed them often zoomed in frame by frame after seeing body worn camera footage a week later in which McCullough identifies himself. He goes back and he re watches all the video and he puts together every piece of evidence explaining how these suspects moved around the neighborhood. And he needed to point that out to the jury because the jury was not going to get that from one day of testimony. Isn't that the prosecutor's job to do that in closing? I don't think that's a rules of evidence argument. I think the prosecutor could have done it in closing, but it might have required a three or four week trial as opposed to a four day trial. Well, maybe that's what's required in a case like this where the federal government decides that the resources are necessary to deploy 922G in this way. I'm not sure. Again, I'm not sure. We're asking questions about the federal rules of evidence, and I'm not sure that what you're raising is responsive. As I looked at this, it seemed to me that people got very fixated with the sequencing of the investigation instead of what the actual evidence shows. And when I at least pulled up the video of what we're actually talking about, maybe it's not a few pixels, but it's not a great video. And I just don't see, I need to better understand why it isn't just the government's job to have the prosecutor stand up and make arguments about the circumstantial evidence that bears on the identification instead of having somebody say, an agent, someone under the auspices of law enforcement, with all that imprimatur that that applies, sits on the witness stand and says, no, trust me, I've spent more time with the videos than you need to. This is the guy. Well, I would say that that does not exactly characterize what his testimony was. He said, based on my review of the videos, I formed the opinion that it was this, the shooter was this person. And he then goes on to say that that is why he then went ahead and got search warrants and an arrest warrant and explains every point of the process. Isn't that the opinions at the end of the testimony after he walked through? So the opinion isn't at the very end of the video. And then he says, and then the body worn camera video. And then he says, I formed the opinion. It was McCullough. And then he says, and as a result, I got a search warrant for Phillips's house and an arrest warrant and a search warrant for the hotel room. Is the government's position that that sequencing of the time, the search warrant was relevant to the jury's consideration? Well, it does explain to the jury why he did what he did afterwards. Well, I think the jury needed to know that there were search warrants executed and that the defendant had been arrested and his cell phone had been seized. And there had been a Nike hat on the dashboard of the car. I think all of those facts were clearly relevant and admissible. What we're talking about is the one sentence where the detective says, I formed the opinion that the shooter was McCullough. Now, if he hadn't said that at all, would the jury have sort of inferred it from the fact that 40 pages later in the testimony, McCullough is arrested by the detective? Which would be a very problematic and reversible inference. Maybe it was the government's job to establish why they believed it was him on the video. You wanted the jury to infer guilt from the fact that he was arrested? No, your honor. I just wanted, I just was explaining that it explains why he was arrested. And he did, the detective did testify on recross that he believed he had probable cause at the time he made the identification. Isn't that just bolstering an opinion that I think you're getting the sense that I already find problematic? The agent sort of reaffirming that he believed he had, I feel very confidently about my opinion. Your honor, he only did that on recross. The government did not elicit that. But what are they supposed to, they have to, once you elicit the opinion, they have to challenge it. And it was challenged. It was challenged extensively on cross-examination. And perhaps this goes to the harmless error argument that the government has, which is that there was extensive cross-examination on whether the detective could see what he said he saw in the video. And that cross-examination did not really land any blows because the jury could see and the judge could see what the detective was describing. And he did not oversell any video. For example, he never said that he saw the word Nike. He saw, he said he saw he could make out the swoosh symbol and he could distinguish that from Puma or Adidas. Did the jurors have the videos in? I believe that the jury had all of the videos that this court now has, the 45 videos that went back with them. I don't think we would have any idea whether they watched them or not. Right. But they had a laptop they could, okay. Yes, your honor. What are the other parts of the, the evidence that you're relying on for harmlessness? For harmlessness, in addition to the video evidence, which they had, there is consciousness of guilt evidence in two forms. One is McCullough deleted from his cell phone before it was seized, all the calls that he made to Phillips right after Phillips' house was searched. He also had a jail, two jail calls to his girlfriend where he discusses hiding a backpack or a book bag in his backyard. The defense in closing suggested to the jury that backpack contained cash with which he would have paid his lawyer. And on rebuttal, the government suggested that maybe that backpack contained the gun that he was hiding because he was afraid the government was going to come search his house. There's also the cell phone records that show that McCullough called Smith, the man who took the victim to the hospital twice the night after the shooting and once the next morning. There's the location evidence. Again, the cell site location shows that he was in the same neighborhood where the shooting occurred, which is also the same neighborhood where he lived. What do you think bears most directly on possession? I think it's the shooting video, which the judge found to be crucial. Harmlessness, sorry. What part of the evidence that you're relying on for bears most directly on possession? I think it's the amassing of the video evidence that traces him through the neighborhood beginning seven hours before until several hours after the shooting and shows that those two suspects, the shooter and the man with the very distinctive silver puffy jacket were walking around that neighborhood together for hours before and after and they appear in the shooting video. It just seems like a tough harmlessness argument if the error is the lay witness opinion about the content of the video to then lean on the video. Well, the error here would be the lay witness opinion based on the content of dozens and dozens of videos, not primarily the shooter video, the shooting video, because admittedly, when you look at the shooting video, you cannot identify the shooter. It's impossible. You'd have to watch all of the other videos pretty carefully and then know the map of that neighborhood and how that suspect walked around the neighborhood before and after until you finally get to clear surveillance photos and images where you can see much more detail including the logo on the jacket. You can see that he has a beard. You can see that he has a hat. You can see that he has a little white t-shirt sticking out from the back of his black jacket and you can see that he's always accompanied by the man with the silver puffy jacket and no other person of the six people on the street that when the shooting occurred, nobody else had clothing like the suspect did, the shooter did. And I think it's fairly safe to say those other people were ruled out based on the video surveillance evidence. Okay, thank you. Thank you very much, James. I appreciate it. I think we're concluded then, so thank you for your advocacy and we'll take the case under advisement.